Filed 7/28/16  P. v. Johnson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062822 |
| v. | (Super.Ct.No. FVI902650) |
| MAYNARD ANDREW JOHNSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Eric M. Nakata, Judge.  Reversed in part; affirmed in part with directions.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Maynard Andrew Johnson, guilty of (1) forcible rape (Pen. Code, § 261, subd. (a)(2));[1] (2) forcible oral copulation (Penal Code, § 288a, subd. (c)(2)); (3) forcible sexual penetration (Penal Code, § 289, subd. (a)(1)); (4) unlawful sexual intercourse with a minor who was more than three years younger than defendant (Penal Code, § 261.5, subd. (c)); (5) willfully committing a lewd or lascivious act upon a child 15 years old when defendant was 10 years older than the child (Penal Code, § 288, subd. (c)(1)); (6) criminal threats (Penal Code, § 422); (7) dissuading a victim or witness from reporting a crime (Penal Code, § 136.1, subd. (b)(1)); and (8) unauthorized cultivation of marijuana (Health & Saf. Code, § 11358). The trial court sentenced defendant to prison for a term of 28 years eight months.

Defendant raises four issues on appeal. First, defendant contends there is not substantial evidence that he used force when committing the acts of oral copulation and sexual penetration. Second, defendant contends the trial court erred by not instructing on the lesser included offenses of non-forcible oral copulation and non-forcible sexual penetration. Third, defendant contends the trial court abused its discretion by granting relocation expenses as part of the restitution award. Fourth, defendant asserts substantial evidence does not support his conviction for unlawful cultivation of marijuana. We reverse the restitution fine, affirm the judgment, and provide directions.

---

[1] In this paragraph, we refer to the versions of the statutes that were effective from 2007 through 2009.

## FACTUAL AND PROCEDURAL HISTORY

A.     PROSECUTION'S CASE

The victim is female and was born in October 1992. Defendant met the victim's mother (Mother) in 1995. Defendant and Mother married in January 1998. Defendant and Mother had two sons together, M. in 1998 and N. in 2000 (the brothers). In 2002, the family moved to Lucerne Valley, in the high desert. Both defendant and Mother worked, and the three children went to school.

In early 2007, when the victim was 15 years old, as defendant hugged the victim, he moved his hands "lower," toward the victim's vagina. Defendant touched the victim's inner thighs, and touched and rubbed the victim's vagina. When defendant touched the victim, he told her, "God wanted it, and it was okay. [The victim] didn't have to hide. It was all right [*sic*]." The touching caused the victim to feel scared and "really confused." The victim was unsure whether she should tell someone about the touching or "just stay quiet." The foregoing type of touching, wherein defendant used his hands to touch the victim's genitals, occurred over a four-month period. Defendant touched the victim "every day." The touching usually occurred before the brothers arrived home from school, and/or before Mother came home while the brothers were outside. Defendant did not threaten the victim during that time.

After those four months passed, defendant began orally copulating the victim. The oral copulation occurred on the living room couch, in the master bedroom, and in the victim's bedroom. The victim was 16 years old or about to become 16 years old when defendant first orally copulated her. During the first oral copulation incident,

3

defendant told the victim he needed to speak with her in his bedroom. The victim went to the bedroom. Defendant "kind of pulled [her] in, shut the door and locked it, and walked [her] over to the bed, sat [her] down," removed her pants, laid her back on the bed, touched her for five or 10 minutes, removed her underwear, and orally copulated her. The contact was skin-to-skin. The victim felt confused, violated, and scared.

The oral copulation occurred two or three times per day, before the brothers arrived home from school, after everyone else had gone to sleep at night, and/or before everyone else had woken up in the morning. The victim did not scream during the incidents because she was "scared, confused, [and] didn't know what to do." The oral copulation lasted 15 minutes, then progressed to 30 minutes, then 60 minutes, then 90 minutes. The oral copulation occurred over a two- to three-month period. During the oral copulation, defendant and the victim did not have conversations, but defendant told the victim, "A lot of people do it. It's okay. God wants us to."

During the oral copulation incidents, defendant removed the victim's clothes because the victim did not move during the incidents. The amount of clothes removed progressed over time from removing clothes from the bottom half of the victim's body to removing all of the victim's clothes. Once defendant began removing all the victim's clothes, he started touching and kissing her breasts and neck. Defendant removed his own clothes after removing the victim's clothes. Defendant placed the tip of his penis into the victim's vagina. Defendant's acts of touching the victim with the tip of his penis occurred over a two-month period. Also during that time period, defendant touched the victim's genitalia with a hard plastic vibrator. Defendant used the vibrator

4

on the victim approximately twice per week for 20 to 30 minutes.  Defendant did not penetrate the victim with the vibrator.

"At times" the victim told defendant, "No.  Stop.  But other times [she] just sat there because [defendant] didn't listen.  He just kept doing it."  When the victim said "No," defendant responded, "It's okay, baby."  After the two months of defendant placing the tip of his penis in the victim's vagina, he inserted the entirety of his penis into the victim's vagina.  The experience caused the victim pain.  The victim "couldn't sit, stand, really do anything, [but] hold [her] sides because [she] was hurting so bad."  The victim told defendant to stop, but defendant "kept going on.  He didn't care."  The victim tried to push defendant off of her, but he would push her and hold her down by her wrists or use his body weight to pin her down.

When the victim "realized that [defendant] was doing something to [her] that wasn't right," she told him she was going to tell Mother about the sexual incidents.  Defendant responded, "No, you're not."  Approximately six months after defendant started touching the victim, "when it progressed a little more and [the victim] was getting tired . . . of hiding stuff" she told defendant she "was going to tell the police," at which point defendant "started making threats that [the victim] would go on life support," or Mother or "whoever [the victim] told" would be placed on life support.  The victim understood defendant's statement to mean defendant "would hurt [the victim] so bad to where [she] was on life support for the rest of [her] life."  The victim also thought defendant would harm Mother.

The victim explained she was afraid of defendant "throughout this whole period." The victim explained that when she was growing up defendant would make her do yardwork as a punishment. Other times, when the victim did not do a task or acknowledge defendant immediately, he would pinch the back of her neck with his fingernails to the point that she would bleed.

At one point, defendant told the victim he would be coming to her room that night. The victim responded, "[G]o F [your]self," and told defendant, "No." Defendant chased the victim with a tennis racquet. The victim ran away "as long as [she] could to the point where [she] couldn't run anymore." When defendant caught up to the victim, he struck both of her elbows with the racquet causing dark purple and black bruising on her arms. The victim covered the bruises with a jacket.

The victim estimated defendant raped her over 100 times and orally copulated her over 100 times. Every time the victim was "afraid of what would happen if [she] said no." The sexual incidents between defendant and the victim were always forceful. The victim explained that she would "have to beg" defendant to attend parties or school dances. If the victim wanted to go to a friend's house or go to a school dance, she would have to let defendant touch her or insert his penis into her. The touching stopped in December 2009 when the police were notified.

B.     DEFENDANT'S CASE

Defendant testified at trial. The following facts are defendant's version of the events. In 2007, defendant and the victim had a volatile relationship, in that the victim appeared to dislike defendant. Defendant also believed Mother disliked defendant at

6

that time. At one point, defendant mentioned to the victim that she and Mother should move out of the house due to their difficult relationships with defendant. The relationship between defendant and the victim improved when defendant told the victim he would act more like her friend than her parent.

In June 2008, the family went to the beach. While at the beach, defendant washed sand off the victim's back and realized the victim "was now a woman," and no longer a child. Approximately three weeks later, defendant began touching the victim in a sexual manner. The victim responded in a positive manner, although she did not reciprocate by touching defendant.

In September 2008, when defendant was 52 or 54 years old, defendant's and the victim's relationship progressed to sexual intercourse. The incident began with play fighting/wrestling in a bedroom. Defendant orally copulated the victim and she had an orgasm, so he knew she was enjoying the experience. There was nothing indicating the victim wanted defendant to stop. At night, defendant slept on the couch in the living room. The victim would come to the living room on her own, and they would engage in consensual sexual intercourse.

If the victim had indicated to defendant that she did not want to engage in intercourse with him, then he would have stopped. On one occasion, defendant was driving the victim home from school and he asked if it would be a good day to engage in sexual intercourse. The victim said "No" because she was menstruating, and the two did not engage in sexual contact. On other occasions, the victim said "she was feeling some discomfort." Defendant responded by telling the victim, "I'll try to get this thing

7

finished as quick as possible."  Defendant believed the victim wanted to engage in sexual intercourse, but was physically uncomfortable.  Defendant denied ever threatening the victim.  Defendant estimated he orally copulated the victim 30 or 40 times and engaged in sexual intercourse with the victim 40 or 50 times from September 2008 through December 2009.

## DISCUSSION

### A.    DURESS

Defendant contends that the findings he used duress when orally copulating (Penal Code, § 288a, subd. (c)(2))[2] and digitally penetrating the victim (former § 289, subd. (a)(1)) are not supported by substantial evidence.

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citation.]  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"  (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

---

[2]  All further statutory references will be to the Penal Code unless otherwise indicated.

8

Section 288a, subdivision (c)(2), prohibits oral copulation accomplished against the victim's will by means of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Section 289, subdivision (a)(1) forbids sexual penetration accomplished against the victim's will by means of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."

"Duress" means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act to which one otherwise would not have been performed or, (2) acquiesce in an act which one otherwise would not have submitted.'" (*People v. Leal* (2004) 33 Cal.4th 999, 1004, 1009.)

The victim testified that defendant was the disciplinarian in the household. When the victim "got in trouble" defendant would keep her home from school and require her to pull weeds or pick up the feces of their four dogs on their five-acre property. The punishment could last one day or "a couple of days." Additionally, when the victim did not do a task or acknowledge defendant immediately, he would pinch the back of her neck with his fingernails to the point that she would bleed.

The victim's half-brother, N., testified that defendant treated the victim "poorly," that defendant was "[a]bsolutely" the "controller" in the household, and that defendant's opinion dominated or his voice was the loudest in the home. The foregoing evidence provides support for the finding that defendant was the authority figure in the home, deciding who to punish and how to punish them.

9

The family attended an Apostolic or Pentecostal Church while living in Ontario, and continued practicing their religion after moving to Lucerne Valley. When defendant spoke to the victim during the sexual incidents, he told her "God wanted it." Thus, in addition to defendant as an authority figure imposing his will onto the victim, the jury could reasonably conclude defendant invoked the additional authority of God in coercing the victim.

Defendant testified that he obtained a prescription for marijuana in March or April 2007, and that he had a prescription in December 2009. The victim stated that defendant became "[s]carier [and] more demanding" when he was under the influence of marijuana. Therefore, in addition to defendant being an authority figure and invoking the authority of God, defendant amplified the effect of his authority by involving drugs.

Additionally, defendant was approximately 52 years old when he initiated sexual contact with the 15-year old victim. During the acts of intercourse, at times, defendant used his body weight to hold the victim down. From the foregoing evidence, the jury could infer defendant was significantly older than the victim and physically larger or stronger than the victim. Further, defendant testified that, while he was not the victim's biological father, he was her dad "for all intents and purposes."

In sum, the evidence reflects defendant occupied the role of a father in the victim's life; he was the authority figure in the house, determining who was punished and how they were punished; he was significantly older than the victim; he was physically larger or stronger than the victim; he was under the influence of drugs; and

10

he invoked God's authority. The evidence reflects that defendant's coercion of the victim was amplified by these various factors. For example, the victim said defendant was "scarier" when he was under the influence of marijuana.

The jury could reasonably conclude from this evidence that defendant implied a threat of danger, hardship, or retribution because of his age, role as father, and physical strength gave him a position of power over the victim, while his prior punishments, such as pinching the victim, and his invocation of God's approval created a threat of future harm or punishment if the victim did not submit to defendant's conduct. Accordingly, we conclude substantial evidence supports the jury's findings that defendant accomplished the acts of oral copulation and digital penetration by means of duress.

B.     JURY INSTRUCTIONS

1.     *PROCEDURAL HISTORY*

During a discussion on jury instructions, defense counsel said, "I'll put in the lessers that I'm looking for." The following day, the trial court and trial counsel discussed the lesser included offense instructions. Defense counsel requested the jury be instructed on assault (§ 240) and battery (§ 242) as lesser included offenses of the sexual crimes. The trial court granted defense counsel's request.

The trial court asked defense counsel, "[A]re there any that I'm not giving that you're requesting?" Defense counsel did not request any further instructions on lesser included offenses. The trial court instructed the jury that assault and battery were lesser included offenses of the charged sexual crimes.

11

2.      *ANALYSIS*

a)      Contentions

Defendant contends the trial court erred by not instructing the jury on the lesser included offenses of non-forcible oral copulation and non-forcible sexual penetration. The People contend defendant forfeited this issue by failing to request the instructions in the trial court. Defendant asserts the trial court had a sua sponte duty to give the instructions and therefore the issue was not forfeited.

b)      Forfeiture

A trial court has a sua sponte duty to instruct on "all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*Id.* at pp. 154-155.) Given the foregoing Supreme Court law, even though defendant's trial counsel did not request the instructions concerning non-forcible sexual offenses, if those non-forcible crimes were lesser included offenses, then the trial court would have been obliged to give the instructions. Thus, we will address the issue.

c)      Background Law

Generally, "a lesser included offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater

12

cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

### d) Oral Copulation

Defendant asserts that, for the oral copulation offense, the jury should have been instructed on non-forcible oral copulation (§ 288a, subd. (b)(2)). The non-forcible offense provides, "[A]ny person over 21 years of age who participates in an act of oral copulation with another person who is under 16 years of age is guilty of a felony." (§ 288a, subd. (b)(2).) The forcible version of the offense provides, "Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished . . . ." (§ 288a, subd. (c)(2).)

Under the elements test, the non-forcible offense is not a lesser included offense of the forcible offense because the non-forcible "sex crime[] require[s] the perpetrator and victim to be within certain age limits while the forcible sex crime[] do[es] not." (*People v. Scott* (2000) 83 Cal.App.4th 784, 794.)

In the First Amended Information, in Count 2, defendant was charged as follows: "On or about January 1, 2007 thru December 2, 2009 . . . the crime of forcible oral copulation in violation of Penal Code section 288a(c)(2), a felony, was committed by [defendant], who did unlawfully participate in an act of oral copulation with [the victim] and did accomplish said act against said victim's will by force, violence, duress, menace and fear of immediate and unlawful bodily injury to said victim and to another." (All caps. omitted.)

13

Count 2 of the First Amended Information does not include allegations regarding defendant's and the victim's ages. Because the non-forcible oral copulation offense requires the perpetrator and victim to be within certain age limits, the allegations in Count 2 do not include all the elements of the non-forcible offense. Thus, the non-forcible oral copulation offense is not a lesser included crime of the forcible oral copulation offense. As a result, the trial court did not err by not instructing on the offense of non-forcible oral copulation (§ 288a, subd. (b)(2)).

Defendant asserts the trial court erred because defendant's and the victim's ages are alleged in Count 5 of the First Amended Information. Defendant asserts that when the First Amended Information is read as a whole, it includes the necessary age allegations for the non-forcible oral copulation offense, i.e., combining Counts 2 and 5.

Count 5 reflects, "On or about January 1, 2007 thru December 2, 2009 . . . the crime of lewd act upon a child, in violation of Penal Code section 288(c)(1), a felony, was committed by [defendant], who did willfully, unlawfully and lewdly commit a lewd and lascivious act upon and with the body of [the victim], who was 15 years old, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the defendant, who was at least 10 years older than [the victim]." (All caps. omitted.)

A lesser included offense is lesser to a particular greater offense; the lesser is included in the greater—the greater being one count, not multiple counts. Due process provides that a defendant must be given notice of the specific charge against him. (*People v. Peyton* (2009) 176 Cal.App.4th 642, 657.) If the trial court were permitted to combine counts to create a lesser included offense, defendants would not have notice of

14

the possible lesser included offenses because there could be a myriad of combinations. Defendants would not know what crimes the trial court may or may not combine to create a lesser included offense. Accordingly, we decline to extend the trial court's sua sponte instructional obligations to include lesser offenses described by a composite of language from more than one count.

We understand that the defendant in this particular case had notice that he needed to defend against the allegation of the victim's age for purposes of Count 5, and therefore, defendant argues that he did not need additional notice of the allegation concerning the victim's age being incorporated into Count 2. This would become a "slippery slope"—one where judges are authorized or obligated to comb through an information to create lesser included offenses from an amalgamation of charges. As set forth *ante*, we decline to extend the trial court's sua sponte instructional obligations in this manner.

### e) Digital Penetration

The non-forcible version of the digital penetration offense provided, "[A]ny person over the age of 21 years who participates in an act of sexual penetration with another person who is under 16 years of age shall be guilty of a felony." (Former § 289, subd. (i).) The forcible version of the digital penetration offense provided, "Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished . . . ." (Former § 289, subd. (a)(1).) The non-forcible version of the offense is not a lesser included

offense of the forcible version of the offense under the elements test because the non-forcible "sex crime[] require[s] the perpetrator and victim to be within certain age limits while the forcible sex crime[] do[es] not." (*People v. Scott*, *supra*, 83 Cal.App.4th at p. 794.)

In the First Amended Information, in Count 3, defendant was charged as follows: "On or about January 1, 2007 thru December 2, 2009 . . . the crime of sexual penetration by [a] foreign object, in violation of Penal Code section 289(a)(1), was committed by [defendant], who committed an act of sexual penetration against the will of [the victim] by means of force, violence, duress, menace and fear of immediate and unlawful bodily injury on [the victim] and another person." (All caps. omitted.)

Under the accusatory pleading test, the allegations do not include the lesser offense of non-forcible sexual penetration because the allegations do not include defendant's and the victim's ages. Given the allegations in Count 3, the greater forcible offense could be committed without committing the lesser non-forcible offense, due to the lack of age allegations. Thus, the non-forcible offense is not a lesser included offense, and the trial court did not err by not instructing the jury on the non-forcible offense.

As set forth *ante*, defendant asserts the age allegations in Count 5 should be incorporated into Count 3 for purposes of determining the lesser included offense. As we explained *ante,* we decline to extend the trial court's sua sponte instructional obligations to include lesser offenses described by a composite of language from more than one count.

C.    RESTITUTION

1.    *PROCEDURAL HISTORY*

During defendant's trial, on November 3, 2014, Mother testified the family's home in Lucerne Valley was foreclosed upon.  Mother explained she moved herself and the children out of state because she wanted a "fresh start" for the family because Lucerne Valley is a "small town," defendant's crimes had been reported in the newspaper, and the victim and the brothers "had a hard time going back to school." Mother explained, "There was a boy at [the victim's] school that kept approaching [the victim] and propositioning her because of what had happened to her."

Defendant's probation report reflects the Victim Compensation Board (the Board) paid for counseling sessions for the victim, and that the victim planned to resume counseling sessions after moving, once she located a therapist at her new location.  In a victim impact statement, written by the victim, she wrote, "All the counseling that I had to go through because of the abuse."  In a victim impact statement written by Mother, she wrote, "I made a choice to leave the town we called home for 10 years, because of the mess you made and to protect my children."

On December 1, 2014, Mother contacted the San Bernardino County Probation Department asserting that the Board assisted Mother and the victim with moving away from California, but that not all the expenses had been covered.  On December 2, Mother faxed a request for restitution in the amount of $3,600 for moving expenses.

17

The court ordered defendant to pay the Board restitution in the amount of $5,430.50. Defendant objected to the victim being awarded $3,600 for the money Mother paid beyond that provided by the Board. The court held a hearing on the restitution issue on January 15, 2015.

At the hearing, the prosecutor explained the Board paid $2,000 for relocation, which included $1,000 for the first month's rent and $1,000 for a deposit. Mother provided a rental truck agreement, airplane boarding passes, fuel receipts, and motel receipts. The amounts totaled $4,227.79.

Defendant's trial counsel argued the receipts were problematic because they reflected travel to Texas, which is not where Mother and the victim ultimately relocated. The prosecutor explained that she sent subpoenas for Mother and the victim to an address in Texas. The court accepted the subpoena address as sufficient proof of Texas being the relocation destination. Defense counsel then argued the proof was not sufficient because it did not reflect the expenses were for moving or that the expenses were incurred due to defendant's actions. The trial court asked defense counsel what further proof the prosecutor should provide. Defense counsel explained he was unable to cross-examine Mother and the victim regarding the expenses. The court replied that defendant did not have a constitutional right to cross-examine Mother and the victim concerning restitution. The trial court ordered restitution in the amount of $4,227.79 and found the expenses were "reasonably related to the issues involved in this case."

18

2.    *ANALYSIS*

Defendant contends the trial court erred by awarding restitution for the victim's relocation expenses without the statutorily required verification.

Section 1202.4, subdivision (f)(3)(I), provided, "Expenses incurred by an adult victim in relocating away from the defendant, including, but not limited to, deposits for utilities and telephone service, deposits for rental housing, temporary lodging and food expenses, clothing, and personal items.  Expenses incurred pursuant to this section shall be verified by law enforcement to be necessary for the personal safety of the victim or by a mental health treatment provider to be necessary for the emotional well-being of the victim."  The term "victim" includes the parent of a victim.  (§ 1202.4, subd. (k)(3)(A).)

The People contend defendant forfeited the issue for appeal by failing to request, in the trial court, verification from law enforcement or a mental health treatment provider.  There is case precedent for a defendant forfeiting the issue of whether substantial evidence supports the finding that the defendant is able to pay his probation fees (§ 1203.1b) when the defendant had notice of the costs but neither objected nor requested a hearing.  (*People v. Snow* (2013) 219 Cal.App.4th 1148, 1151.)  In the instant case, defendant requested a hearing.  Additionally, defense counsel argued the prosecution's proof was not sufficient because it did not reflect the expenses were for moving or that the expenses were incurred due to defendant's actions.  Given defense counsel's arguments, we conclude defendant did not forfeit the issue of needing

19

verification that the expenses were necessary for safety or mental health reasons (§ 1202.4, subd. (f)(3)(I)).

The People concede the necessary verification proof was not provided. Our review of the record reflects verification that the move was necessary was not provided via a law enforcement officer or mental health treatment provider. Accordingly, we conclude the trial court abused its discretion by awarding the relocation restitution without the statutorily required verification. (See *Luis M v. Superior Court* (2014) 59 Cal.4th 300, 305 [abuse of discretion standard applies].)

The People contend remanding the matter for a hearing where the verification proof could be provided would be a waste of judicial resources because the record reflects the victim required mental health treatment before and after moving away from California due to defendant's crimes. While we agree the record reflects the victim received mental health treatment, that does not equate with an opinion from a mental health provider that the move was necessary for the victim's emotional well-being. Accordingly, we must remand the matter to the trial court for a hearing wherein proof can be offered (1) by a law enforcement officer verifying the move was necessary for the victim's personal safety; and/or (2) by a mental health treatment provider verifying the move was necessary for the victim's emotional well-being (§ 1202.4, subd. (f)(3)(I)).

Defendant also asserts the $2,000 in relocation expenses that was paid by the Board is subject to the verification requirement, such that substantial evidence also does not support $2,000 of the $5,430.50 defendant was ordered to pay to the Board. Section

1202.4, subdivision (f)(2) provides, "Restitution ordered pursuant to this subdivision shall be ordered to be deposited to the Restitution Fund to the extent that the victim . . . has received assistance from the . . . Board." Because the $2,000 in relocation expenses paid by the Board could be viewed as deriving from the statutory authority in section 1202.4, subdivision (f)(3)(I), providing for relocation expenses, we conclude the $2,000 in relocation expenses paid by the Board should also be verified as by a law enforcement officer or mental health treatment provider as funding a necessary relocation. (§ 1202.4, subd. (f)(3)(I).)

D. MARIJUANA

1. *FACTS*

a) Prosecution's Case

Defendant smoked marijuana "off and on for several years." When defendant smoked, he smoked several times per day. Defendant obtained a medical marijuana card so he could purchase marijuana legally. Defendant "gutted" the bathroom in the family's garage and converted it into a space for growing marijuana. Mother saw eight to 12 marijuana plants in the bathroom. The plants were approximately three and a half feet high. Defendant harvested the marijuana from the plants. Defendant placed the marijuana in mason jars. Defendant also had mason jars of marijuana he purchased. Defendant shopped at several marijuana dispensaries. Mother knew defendant had "more plants" than "he was allowed to grow" because defendant told her he had more than was allowed.

Defendant's medical marijuana card expired in approximately November 2009. "A couple of times" defendant encouraged Mother to try marijuana for her back problems, but Mother refused.

On December 2, 2009, after Mother instructed the victim to call the police about defendant's offenses, defendant instructed M. to retrieve defendant's marijuana from an upstairs closet. M. retrieved a two-foot by one-foot shopping bag that contained seven or eight mason jars of marijuana. The majority of the jars were filled to the top. Defendant complained about the amount of marijuana M. had retrieved. Defendant asked what he was supposed "to do with this whole bag." Defendant took the bag of marijuana and left the house.

Also on December 2, 2009, San Bernardino County Sheriff's Deputy Vasquez searched defendant's home. During the search, Deputy Vasquez found marijuana in 14 mason jars. The Deputy also found marijuana plants in the garage.

b)      Defendant's Case

Defendant estimated he obtained a prescription for marijuana in March or April 2007. His original prescription expired prior to December 2009, but he renewed the prescription and therefore had a valid prescription in December 2009. Defendant was prescribed marijuana due to "emotional issues."

2.      *ANALYSIS*

Defendant contends substantial evidence does not support the finding that he lacked a prescription for marijuana in December 2009 and that he had more marijuana than was needed for his personal medical needs. We will assume, without deciding, that

the evidence reflects defendant had a valid medical marijuana prescription in December 2009. We therefore focus on defendant's contention that the prosecution failed to prove he had more marijuana than was needed for his personal medical needs.

Defendant was convicted of unauthorized cultivation of marijuana. (Health & Saf. Code, § 11358.) Under the Compassionate Use Act (CUA), that prohibition against cultivation of marijuana does not apply to a medical marijuana patient who "cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (Health & Saf. Code, § 11362.5, subd. (d).) "By this and related provisions, the CUA provides an affirmative defense to prosecution for the crimes of possession and cultivation." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1013.) "Because the statute provides a limited affirmative defense, the burden is, of course, on the defendant to raise the defense and prove its elements." (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1551, fn. 17.) However, the defendant need only "raise a reasonable doubt as to those facts rather than to prove them by a preponderance of the evidence." (*People v. Mower* (2002) 28 Cal.4th 457, 464, 483.)

The CUA does not "specify an amount of marijuana that a patient may possess or cultivate; it states instead that the marijuana possessed or cultivated must be for the patient's 'personal medical purposes.'" (*People v. Kelly*, *supra*, 47 Cal.4th at p. 1013.) This means a patient may "cultivate *any amount of marijuana reasonably necessary for his or her current medical condition.*" (*Id.* at p. 1043.) For example, "a person who claims an occasional problem with arthritis pain may [not] stockpile 100 pounds of marijuana just in case it suddenly gets cold." (*People v. Trippet*, *supra*, 56 Cal.App.4th

23

at p. 1549.) "What precisely are the 'patient's current medical needs' must, of course remain a factual question to be determined by the trier of fact." (*Ibid.*)

We examine whether the record contains substantial evidence that, if believed by a rational trier of fact, would have raised a reasonable doubt as to whether defendant cultivated no more marijuana than the amounts reasonably related to his medical needs. (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

Defendant did not explain how much marijuana he needed to treat his emotional issues. Defendant did not explain how much marijuana the doctor recommended he consume for his emotional issues. Mother testified that defendant smoked marijuana several times per day, but it was not explained if that was for medical purposes, recreation, or both. Given the lack of evidence reflecting how much marijuana defendant needed to treat his emotional issues, defendant did not establish a reasonable doubt that the marijuana was cultivated for his personal medical needs.

## DISPOSITION

We reverse $2,000—of the $5,430.50—of the reimbursement defendant was ordered to pay to reimburse the Victim Compensation Board for relocation expenses. The $4,227.79 in victim restitution for relocation expenses is reversed. (§ 1202.4, subd. (f)(3)(I).) Within 90 days of the remitter being issued by this court, the trial court shall hold a hearing on the issues of victim restitution (§ 1202.4, subd. (a)(1)) and reimbursement to the Victim Compensation Board (§ 1202.4, subd. (f)(4)(A)). At the hearing, if relocation expenses are awarded, the evidence must meet all the necessary

24

requirements, including those set forth in section 1202.4, subdivision (f)(3)(I).  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

McKINSTER

J.